# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6468 | **DATE** | September 28, 2001 |
| **CASE TITLE** | | *Erickson v. Schomig* | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Erickson's petition for a writ of habeas corpus based on ineffective assistance of counsel at the sentencing phase of his state court proceedings is granted, and his petition is denied in all other respects. We hereby vacate Erickson's sentence of death. The state shall have 180 days from the issuance of this order to resentence Erickson. On the court's own motion, execution of this order shall be stayed pending the disposition of any appeal filed by the parties. It is further ordered that Erickson's motions for a stay and for discovery are denied. The clerk is directed to terminate this case and enter judgment in Erickson's favor.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 2 8 2001 | | 73 |
| ✓ | Notified counsel by telephone. | | | | |
| | Docketing to mail notices. | | docketing deputy initials | | |
| ✓ | Mail AO 450 form. | | date mailed notice | | |
| | Copy to judge/magistrate judge. | | | | |
| RTS | courtroom deputy's initials | 01 SEP 28 PM 2:04 | Date/time received in central Clerk's Office | mailing deputy initials | |

PI·CKETED

SEP 2 8 2001

UNITED STATES ex rel.      )
PAUL S. ERICKSON, N33213,    )
     Petitioner,          )
                     )
       v.             )      99 C 6468
                     )
JAMES M. SCHOMIG, Warden of the   )
Pontiac Correctional Center,      )
     Respondent.        )

## MEMORANDUM OPINION AND ORDER

Defendant Paul Erickson was convicted in the circuit court of Cook County by a jury of murder and concealing a homicidal death in connection with the rape and death of fifteen year-old Elizabeth Launer. At sentencing, Erickson waived a jury and the court sentenced him to death for murder, an extended term of 60 years for rape, and a consecutive term of 10 years for concealment of a homicidal death. Erickson filed a direct appeal and two state post-conviction petitions and pursued these cases unsuccessfully up to the United States Supreme Court.

Erickson now petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising ten grounds for relief. He also seeks discovery pursuant to Rule 6 of the Rules Governing Habeas Corpus Cases Under §2254 and a stay of this petition while he pursues that discovery. For the following reasons, the court denies Erickson's motions for discovery and a stay, and finds that Erickson's waiver of a sentencing jury did not violate his constitutional rights but that he nevertheless received ineffective assistance of counsel at sentencing and is entitled to relief under § 2254.

## I.  Jurisdiction

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L 104-132, 100 Stat. 1214 (the "AEDPA"), apply to Erickson as he filed his petition after the AEDPA's effective date. This is Erickson's first petition and he filed it within a year after the conclusion of proceedings relating to his second state petition for post conviction relief. *See See* 28 U.S.C. §§ § 2244(d)(2), 2254(b) & (d).  Therefore, the court has jurisdiction to consider Erickson's petition.

## II.  Background

On August 4, 1982, the body of Elizabeth Launer was found in a retention pond in Rolling Meadows, Illinois.  Launer had been stabbed in the neck, the chest, and the abdomen. Erickson was charged with a total of ten counts stemming from Launer's murder and rape and prior acts of violence.[1]  Before trial, Erickson attempted to waive his right to have a jury to consider the imposition of the death penalty if he was convicted of murder.  The court, however, refused his waiver and Erickson proceeded to trial before a jury.

As discussed below, although Erickson denies that he murdered Launer, he has not presented clear and convincing evidence rebutting the statutory presumption of correctness. See 28 U.S.C. § 2254(1). Accordingly, the court presumes that the state court's factual determinations are correct. *See id.*; *see also Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Sanchez v. Gilmore*,189 F.3d 619, 623 (7th Cir.1999), *cert. denied sub nom. Sanchez v. Schomig*, 529

---

[1]  Specifically, Erickson was charged with intentional murder (Count I); knowing murder (Count II); felony murder predicated upon rape (Count III); rape (Count IV); unlawful restraint (Count V); concealment of a homicidal death (Count VI); armed violence predicated upon the prior counts of knowing murder, felony murder, rape, and unlawful restraint (Counts VII-X, respectively).  In the interests of completeness, the court notes that after a jury found Erickson guilty on all counts, the circuit court merged the conviction of unlawful restraint into the rape conviction. No judgment was entered on the armed-violence counts.

U.S. 1089 (2000). Thus, the court adopts the following factual background from the record and the opinions of the Illinois Supreme Court in *People v. Erickson*, 117 Ill.2d 271 (Ill. 1987) (state direct appeal) ("*Erickson I*"), *cert. denied*, 486 U.S. 1017 (1988), *rehearing denied*, 487 U.S. 1283 (1988), *People v. Erickson*, 161 Ill.2d 82 (Ill. 1994) (first state post-conviction appeal) ("*Erickson II*"), *cert. denied*, 514 U.S. 1107 (1995), and *People v. Erickson*, 183 Ill.2d 213 (Ill. 1998) (second state post-conviction appeal) ("*Erickson III*").

Testimony proffered by the State established that, on the evening of July 30, 1982, Erickson (who was twenty-four years old), at the request of a former girlfriend, Lisa Soderberg, bought alcoholic beverages and rented a motel room at the Rolling Meadows Holiday Inn for a group of five juveniles: Soderberg, Thomas Fairweather, Michael Blanchard, Renee East and the victim, Elizabeth Launer. Soderberg was sixteen years old, Fairweather, Blanchard, and Launer were fifteen years old, and East was thirteen years old. Later in the evening, East left the motel, leaving Erickson in the room with Soderberg, Fairweather, Blanchard, and Launer.

### A. Fairweather's Testimony

Fairweather testified for the State as follows. At approximately 11:30 p.m., Erickson approached him, walked with him outside, and asked whether or not he could keep his "mouth shut" regardless of "how bad a crime [he] was to witness." (R. 1325). Fairweather said he could, and asked Erickson what he had in mind. Erickson told him that he intended to have sex with Launer because "he went out with her the night before and all she did was prick tease him." (R. 1326). According to Fairweather, Erickson said that he would rape Launer if she did not cooperate.

Fairweather expressed concern about the possibility that Launer would report the rape to the police. In response, Erickson told him that, after the rape she would "never go home again." (R. 1326). When Fairweather again expressed concern regarding the police, Erickson stated that they would not be caught and said that he would be the one to kill Launer. (R. 1327).

Erickson then pulled a knife from underneath the driver's seat of his car. He also showed Fairweather two neckties and a rolled up sock. He and Fairweather returned to the hotel room and then called Blanchard and Fairweather into the hall to talk. According to Fairweather, Erickson suggested the following plan. First, to get rid of Soderberg, Erickson suggested that Fairweather provoke an argument with her so that she would get angry and leave. Erickson also gave the two ties to Blanchard and the sock to Fairweather. Because Erickson did not want to rape Launer at the motel, he told Fairweather and Blanchard that the group would leave the motel in his car.

Fairweather testified that Erickson instructed Blanchard to sit in the front seat on the passenger's side next to Launer (who would thus be seated between Blanchard and Erickson). Erickson also told Fairweather to sit in the back seat on the passenger's side. When Erickson gave the signal, Fairweather was to reach over the seat and stuff the sock into Launer's mouth. Fairweather and Blanchard would then grab Launer, tie her hands with one necktie, and place the other necktie over her mouth. According to Fairweather, Erickson said they would then "take her clothes off, rape her, kill her and get rid of the body."

Consistent with the instructions provided by Erickson, Fairweather started an argument with Soderberg, which caused her to leave. The group (Erickson, Blanchard, Fairweather, and Launer) left the motel in Erickson's car at approximately 3:00 a.m. positioned according to his

instructions. Erickson drove to the Carriage Way apartment complex in Rolling Meadows and parked in a secluded grassy area between some tennis courts and an open field.

After Erickson nodded at Fairweather, Fairweather unsuccessfully tried to place the sock in Launer's mouth. As she struggled, Erickson grabbed her and tried to stuff the sock into her mouth. When he was unable to do so, he slapped her face and Launer screamed and began to cry. Fairweather testified that he did not see who bound Launer, but did see Erickson pull a knife from under the front driver's seat and begin to cut Launer's clothing.

Saying that he did not want to have anything to do with what was occurring in the car, Blanchard asked Fairweather for cigarettes and left the vehicle. Blanchard walked approximately twenty-five yards away from the car and sat on the grass with his back to the car. Inside the car, Erickson removed Launer's clothing and laid her across the front seat. Fairweather, who was still in the back seat, saw Erickson position himself on his knees between Launer's legs and heard a zipper being unzipped. Launer told Erickson that she would "pay him back" and "come back to haunt him." (R. 1350). Fairweather then heard Launer cry and moan. Erickson slapped Launer and said, "open up, bitch."

According to Fairweather, Erickson lowered himself on top of Launer. A short while later, Fairweather heard a zip and snap and Erickson left the car. Fairweather got into the front seat and tried to free Launer, who was nude and bound by the neckties. Launer begged Fairweather not to hurt her, and Fairweather told her, "I am going to try to get you out of here. I am going to help you. This guy is crazy." (R. 1353). As Fairweather began to loosen one of the neckties, Erickson returned and got into the back seat. Although Fairweather denied having any sexual contact with Launer, he testified that he "pretended" to have sexual intercourse with her.

Subsequently, Erickson got out of the car, opened the front door, and pulled Launer out. Fairweather picked up her clothes, and Erickson pulled Launer to the nearby retention pond while Fairweather walked alongside them.

Erickson forced Launer to the ground on her back. Launer began to plead for mercy, begging Erickson not to hurt her or kill her. (R. 1362). In response, Erickson told her "Sorry. It's got to end like this because you had to be such a prick tease." (R. 1363). Fairweather held her head, Erickson pulled out the knife and raised the knife over Launer. As Launer screamed, Erickson stabbed her in the chest. Fairweather released Launer's head and got up. While he was walking away, he "heard the knife go into her body again." (R. 1365). On cross-examination, Fairweather testified that his hands were bloody but that Erickson's were not. (R. 1450-51). He also claimed that blood had gotten onto his hands and pants when he picked up Launer's body to throw her into the water. (R. 1452).

Erickson called out to Fairweather, who walked back towards the body. Fairweather and Erickson threw Launer's body and her clothing into the pond, returned to the car, and left the scene along with Blanchard. The trio then went to the home of Erickson's girlfriend, Mickey Jaksch. They woke her up and, according to Fairweather, Erickson told her that he had raped and killed a girl.[2]

On cross-examination, Fairweather acknowledged that he also had been charged (as a juvenile) with murder, rape, concealment of a homicidal death, unlawful restraint, and armed

---

[2] Jaksch, who later testified as part of the State's case in chief, corroborated Fairweather's testimony as to this admission. (R. 1515-1518). Specifically, she testified that Erickson told her that he had raped and killed a girl named Liz and asked her to be his alibi.

violence. The State, however, offered him a sentence of approximately four years, with the possibility of a reduction for good time served, if he pleaded guilty to one charge and testified.

### B. Blanchard's Testimony

Blanchard also testified for the State. He stated that Erickson initiated a conversation with him and Fairweather wherein Erickson told them that he wanted to have sex with Launer. Erickson "talked about raping Launer and killing her if she resisted." Erickson subsequently approached Blanchard and Fairweather, gave Fairweather a sock, and told him to reach over the seat and put the sock into Launer's mouth to gag her. Erickson also gave Blanchard two or three neckties so Blanchard could bind Launer. Blanchard kept one and returned the others.

Blanchard testified that he, Erickson, Fairweather, and Launer left the motel and drove to an apartment complex. Erickson drove, Blanchard sat on the passenger side of the front seat, Launer sat on the front seat between Erickson and Blanchard, and Fairweather sat in the back. Erickson parked towards the back of the complex, next to some tennis courts and a grassy field. Blanchard saw Erickson look into the back seat and nod his head. Fairweather reached over the front seat and unsuccessfully tried to place the sock into Launer's mouth.

Blanchard then said that he saw Erickson and Launer struggle, but did not see Erickson bind or gag her. Blanchard got out of the car and walked about twenty yards away. He testified that he heard crying and moaning sounds coming from the car. A short while later, he saw Erickson pull Launer out of the car. Erickson, Fairweather, and Launer walked into a wooded area and Blanchard lost sight of them. He did, however, hear moaning and sobbing, followed by a scream. A few minutes later, he heard a splash. Erickson and Fairweather then returned to the car and the three men drove to the home of Jaksch, Erickson's girlfriend.

While they were en route to Jaksch's home, Blanchard stated that Erickson admitted that he had stabbed Launer. He also stated that, after they arrived at the house, Erickson told Jaksch "that he just killed somebody: 'her name was Liz.'" On cross-examination, Blanchard testified that he had been charged in a juvenile petition with concealment of a homicidal death. He also acknowledged that, in return for his testimony, he expected the State to drop the charge.

## C. Erickson's Testimony

Erickson took the stand as the sole witness in his defense. His testimony materially differed from that of Fairweather and Blanchard, particularly as to who decided to rape and kill Launer and who actually killed her. Specifically, Erickson testified that Fairweather said he wanted to have sex with Launer, that he would rape her if he had to, and that "[Launer] would never go home again." Erickson also stated that Fairweather supplied the sock and neckties, although he admitted that the tie used to bind Launer's hands belonged to his father.[3]

According to Erickson, he helped Fairweather and Blanchard tie Launer but did not rape Launer. Instead, he said that he left the car after Launer had been bound and, when he returned, saw that Fairweather's pants were down. Fairweather got up and pulled up his pants, and the two of them pulled Launer from the car and walked towards the retention pond.

---

[3] With respect to the tie, the State also presented the testimony of Billie Eugene Johnson. Johnson testified that Lisa Soderberg introduced him to Erickson. According to Johnson, on August 3, 1982, Erickson told him that he had raped and fatally stabbed Launer. (R. 1608-09). When Johnson expressed disbelief, Erickson said he would prove it because he needed to retrieve the body to remove one of the neckties binding Launer since it belonged to his father and could link him to the crime. (R. 1609). Erickson and Johnson went to the retaining pond, which had a "terrible odor." (R. 1610). Erickson then brought Launer's bloated body to the edge of the pond, removed the tie, and pushed the body back out into the water. (R. 1613). Erickson subsequently threw the tie out of the car window because it "smelled very bad of death." (R. 1614).

-8-

Launer was told to lie down on the ground. After she did so, Erickson knelt down and held her feet and Fairweather stabbed Launer in the chest with a knife (which Erickson admitted that he owned). He and Fairweather threw Launer's body and the clothes into the pond and left. Erickson acknowledged that the group then drove to Jaksch's house However, he stated that he told Jaksch only that "he was involved in the killing of a girl." On August 6, 1982, the Naperville Police arrested Erickson and charged him with the rape and murder of Elizabeth Launer. The complaint was superseded by an indictment alleging murder, rape, unlawful restraint, concealment of a homicidal death, and armed violence. After a trial, a jury found Erickson guilty on all counts.

## D.    Sentencing

As noted above, prior to trial, Erickson had unsuccessfully attempted to waive his right to have a jury consider the imposition of the death penalty if he was convicted of murder. After the jury returned its verdict, Erickson again tendered a waiver of a sentencing jury. This time the court accepted the waiver and commenced a sentencing hearing pursuant to Ill. Rev. Stat. ch. 38, ¶ 9-1(d)(3) (1981).

The State presented additional evidence in aggravation during the sentencing hearing. First, it presented the testimony of Billy Johnson, who recounted an incident which occurred approximately two weeks before Launer's death. Johnson testified that Erickson suggested that they go to O'Hare International Airport to pick up a prostitute. They traveled to O'Hare where, according to Johnson, Erickson told hin they would have to "get rid" of (*i.e.*, kill) the prostitute after they had sexual relations with her.

Second, the State presented the testimony of Leslie Blackstock, who said Erickson had raped her in 1979. Third, Marge Rader testified that Erickson had tried to rape her in March of 1979 and that he had later slashed all the tires on her car. One week after that, Erickson approached her with a knife and told her that he should have slashed her instead of the tires. Fourth, Therese Moran testified that Erickson had convinced her to go into a women's bathroom where Erickson had intercourse with her. (R. 2232-33). Erickson impregnated Moran and told her not to tell anyone they were having a sexual relationship.

Fifth, the State offered the testimony of Rolling Meadows Police Detective Greenway. Greenway testified he had recently spoken with one of Erickson's former girlfriends, Joanne Combs. Over the defense's objection, Greenway testified that Combs told him that Erickson slapped her around, impregnated her, and threatened to kill her if she told anyone that he was the father. Greenway also testified that Combs related to him that Erickson had admitted to her that he had once stabbed a black man to death.

Finally, Harold Matthews testified that he had been arrested and incarcerated for failing to pay for a stay at the Rolling Meadows Holiday Inn. Matthews and Erickson met at the Cook County Jail. According to Matthews, Erickson told him that the Holiday Inn that was the source of Matthews' troubles was the place where he had a party and stabbed a girl. Erickson also told him that "it was a big thrill" and described the killing in "a graphic, vivid manner." (R. 2285, 2299).

Matthews' reaction to this conversation was to feel that Erickson was a "modern day Jack Ripper." (R. 2300). He promptly told a guard that Erickson had confessed to a murder. Matthews subsequently went to the television room where Erickson and other inmates were

watching a show featuring a man physically abusing a woman. According to Matthews, Erickson cheered the man on. After presenting Matthews' testimony, the State rested in aggravation.

Erickson then presented two mitigating factors: (1) "no significant history of prior criminal activity"; and (2) the presence of an "extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." *See* Ill. Rev. Stat. ch. 38, ¶¶ 9-1(c)(1) & (2) (1981). In support of the second mitigating factor, Erickson offered the testimony and report of John Weliczko, an individual who claimed to be a psychotherapist and who had been retained by Erickson's parents. Weliczko was the only witness to testify on behalf of Erickson during the sentencing proceedings. The defense intended Weliczko to opine, as a mental health expert, that a psychological condition explained Erickson's behavior. *See* Ill. Rev. Stat. Ch. 38 ¶ 9-1(c)(2) (1981).

In his written "psychological evaluation," Weliczko described Erickson as manipulative and narcissistic with a "grandiose sense of self-importance," "feelings of entitlement," "lack of empathy for the pain of others," and a preoccupation with sexual fantasies of women. (R. 2673). He also questioned whether Erickson both despised and adored Launer. (R. 2674). In addition, he stated that Erickson's parents "cannot be blamed for his disorder. The real causes are society, peers and the judicial system who allowed his self-deception to escalate to a point of self-destruction." (R. 2675) (emphasis in original). Finally, he concluded that the actions of Erickson and his accomplices:

> must be viewed as a group portrayal of a narcissistically preoccupied teenage band of reckless, unempathetic and psychologically unstable group of young men and women. [Erickson] cannot be the only guilty part. The blood of the victim will never be psychologically excised from the stained group who

partied at the Holiday Inn, and those who assisted in the concealment of evidence.

(R. 2675) (emphasis in original).

At the sentencing hearing, Weliczko claimed that, among other degrees, he held a masters degree in psychology from Harvard University and a doctorate in psychology from the University of Chicago. However, during cross examination, he admitted that he had received a masters in theology from the Harvard Divinity School and that his doctorate was a ministry degree in pastoral counseling and psychology from the Chicago Theological Seminary, an entity associated with the University of Chicago. Weliczko asserted that he nevertheless practiced psychology and thus was a mental health care provider. However, he also admitted that he did not have any degrees in psychology or any medical training and that he had previously only testified as a pastoral counselor. (R. 2365).

The trial judge refused to qualify Weliczko as an expert, but did permit him to offer lay testimony. He also denied Erickson's motion for a continuance to secure the testimony of a qualified mental health expert, ruling that such additional testimony would be cumulative to Weliczko's testimony, which the court would be considering.

In rebuttal, the State called Dr. Gilbert Bogen, a staff psychologist with the Psychiatric Institute of the Circuit Court of Cook County. Dr. Bogen opined that Erickson was legally sane at the time of the offense, appreciated the criminality of his actions, and was able to conform his conduct to the requirements of the law. (R. 2430, 2578). He also opined that Erickson had an antisocial personality disorder (which he defined as being manipulative with a lack of empathy for others) with some features of narcissism.

-12-

At the close of the aggravation phase of sentencing, Erickson's trial counsel requested a continuance because Erickson had a doctor's appointment related to a knee injury. Counsel advised the court that Erickson was taking medication for his knee problem which was "giving him slight feelings of detachment from reality." (R. 2302-03). The court denied Erickson's motion.

After reviewing all of the evidence in aggravation and mitigation, the trial judge found beyond a reasonable doubt the existence of one statutory aggravating factor: that Launer had been killed in the course of a felony (rape) and that Erickson had actually killed her. *See* Ill. Rev. Stat. ch. 38, ¶ 9-1(b)(6) (1981). The court also found that no mitigating factors precluded the imposition of the death penalty and stated that, if it could consider the feelings of Erickson's parent, its judgment would be different. The court then sentenced Erickson to death. The Illinois Supreme Court affirmed, *Erickson I*, and the United States Supreme Court declined to issue a writ of certiorari, 486 U.S. 1017, 108 S.Ct 1754 (1988).

### E.    Erickson's First State Post-Conviction Petition

Erickson then sought relief under the Illinois Post Conviction Hearing Act, Ill. Rev. Stat. ch. 38 ¶ 122-1, *et seq*. (1981). The case was assigned to Judge Toomin, who had presided over Erickson's trial, but was subsequently transferred to Judge Richard Neville. The circuit court dismissed Erickson's petition in its entirety and the Illinois Supreme Court affirmed the denial of all relief. *See Erickson II*. Erickson's claims primarily related to Weliczko's credentials (or, more accurately, the lack thereof). Erickson began by asserting that Weliczko's testimony prevented him from receiving a fair sentencing hearing, pointing to a transcript from the Chicago Theological Seminary and an affidavit from an official at Gordon College in

-13-

Wenham, Massachusetts, showing that Weliczko had earned a degree in philosophy there. Noting that the fact that Weliczko was not a psychologist was clear from the trial record, the Illinois Supreme Court concluded that the claim based on Weliczko's fake credentials was procedurally defaulted because it could have been raised on direct appeal.

Erickson also claimed that his counsel was ineffective for two reasons. First, he challenged counsel's failure to verify Weliczko's credentials and his decision to put Weliczko on the stand, asserting that Weliczko's testimony undermined the defense strategy. The Illinois Supreme Court found that these claims were procedurally defaulted because, like the other claims based on Weliczko's ersatz credentials, they could have been raised on direct appeal since "any inadequacy there may have been with counsel's representation with respect to Weliczko was evident when Weliczko was cross-examined." *Erickson II*, 161 Ill.2d at 89.

Second, Erickson contended that trial counsel failed to investigate and obtain mitigating evidence, including a competent psychological profile. Erickson asserted that he, in fact, had a history of alcoholism and drug addiction and had endured a childhood of psychological, emotional and sexual abuse. In support, he offered reports from two psychologists – Dr. Michael Gelbort (Erickson Ex. 6) and Dr. Brad Fisher (Erickson Ex. 7) – who would have testified to this effect. Dr. Fisher's report also contained a review of Weliczko's report. In short, Dr. Fisher noted that Weliczko was not a qualified medical professional and concluded that Weliczko's report did not contain the information found in a competent psychological evaluation or substantiation for Weliczko's conclusions.

Both Dr. Gelbort and Dr. Fisher administered a battery of psychological tests and interviewed Erickson thoroughly. Their reports show that Erickson suffered a number of head

traumas which resulted in an alteration of consciousness. He was dropped on his face as a baby and as a teenager had blurred vision, spells of unconsciousness, and concussions from at least eight separate falls. He also had headaches, vomiting, and nerve injuries related to the head trauma

Erickson's mother was schizophrenic and he was sexually abused by a priest as a child. In response, he began to abuse drugs and alcohol at an early age. He also turned to psychotropic drugs known to alter brain functioning and to cause brain damage. When he was thirteen years old, he was admitted to the emergency room due to severe alcohol intoxication and he also unsuccessfully attempted to commit suicide by taking a drug overdose.

Neurophysical tests showed that Erickson had brain damage in the dominant cerebral hemisphere which caused him to have difficulty understanding what was expected of him, processing information, dealing with quickly evolving situations, and learning from his own or other's behavior and mistakes. In addition, Erickson's drug and alcohol use at the time of Launer's death augmented the behavioral problems caused by Erickson's brain damage and further diminished his ability to control his actions and make reasoned judgments.

Erickson also submitted affidavits from two former teachers, both of whom said that Erickson had been a well-adjusted student and that they were shocked to hear that he was involved in Launer's death. The Illinois Supreme Court found that, in light of the record as a whole, testimony from the psychologists and Erickson's former teachers would not have altered the outcome.

In addition, Erickson asserted that he was entitled to an evidentiary hearing to further investigate the effect of the denial of his motion for a continuance to obtain a psychological

evaluation. The Illinois Supreme Court held that this issue had been previously raised on direct appeal and thus could not be relitigated in collateral proceedings.

Erickson also claimed that he was entitled to relief because he waived a jury for the sentencing phase without knowing that if even one juror disagreed, he could not receive the death penalty. Erickson had answered affirmatively when the trial judge asked if he understood that, like a finding of guilt, death had to be the jury's unanimous choice, meaning that all twelve jurors had to agree. He unsuccessfully challenged the sufficiency of this admonishment on direct appeal. Nevertheless, during his post-conviction proceedings, he submitted an affidavit saying that he did not truly understand the unanimity requirement. The Illinois Supreme Court rejected this argument, noting that Erickson could not prevail in light of the sufficient admonishment and his own acknowledgment, at the time, that he understood it.

In addition, Erickson asserted that he testified only because his counsel asked him whether he would like to go to jail for many years without telling his story. The Illinois Supreme Court noted that Erickson was aware of his right not to testify and that, in fact, his testimony was the only evidence offered to counter the State's case. Finally, Erickson unsuccessfully challenged the constitutionality of Illinois' death penalty.

Although the Illinois Supreme Court affirmed the dismissal of Erickson's petition, *see Erickson II*, Justice McMorrow (joined by Justice Harrison) filed a dissenting opinion stating that she believed Erickson had not waived his claims based on Weliczko's credentials and that he was entitled to an evidentiary hearing on this issue. *Id*. 161 Ill.2d at 96-119. The United States Supreme Court subsequently denied certiorari. 514 U.S. 1107 (1995).

### F. Erickson's Second State Post-Conviction Petition

A defendant's failure to raise a claim of ineffective assistance of appellate counsel in a state post-conviction does not operate as a waiver of this issue if the same attorney represented the defendant on direct appeal and in his initial state post-conviction petition. *Erickson III*, 183 Ill.2d at 223. Erickson's second state post-conviction petition thus contained ineffective assistance claims directed at his original appellate attorney, who had represented him on direct appeal and in his initial state post-conviction petition.

In the second state post-conviction petition, Erickson first claimed that counsel's representation during sentencing was deficient because counsel relied on Weliczko and failed to uncover and present additional mitigating evidence. In support, Erickson submitted an affidavit from another mental health professional as well as affidavits from family members who said that they would have testified had they been asked to do so. The Illinois Supreme Court found that the claim was barred by res judicata because it was raised in the first state post-conviction proceeding, where Erickson had an opportunity to develop the record.

Erickson also asserted that his counsel was ineffective because he failed to raise issues relating to Weliczko on direct appeal and thereby caused him to waive these claims. The Illinois Supreme Court found that, while Weliczko's characterization of Erickson may not have helped him, it did not contribute to the trial court's sentencing decision. In support, the Illinois Supreme Court noted that the aggravating factors listed by the trial judge did not include Weliczko's testimony but, instead, emphasized the heinous nature of the crime and Erickson's prior history of sexually attacking women.

The Illinois Supreme Court acknowledged that the trial judge referred to Weliczko's testimony when it summarized the mitigating evidence. It found, however, that the trial judge did not consider this testimony to be aggravating and that, regardless of Weliczko's opinion, the circumstances of the crime and the aggravation evidence presented by the State (portraying Erickson as calculating, aggressive and violent) made it "unlikely" that the trial court's conclusion would have been different if Weliczko had not testified. *Erickson III*, 183 Ill.2d at 229. It thus concluded that counsel's use of Weliczko did not prejudice Erickson.

Erickson also claimed that the cumulative effect of counsel's errors – *i.e.*, counsel's failure to introduce additional mitigating evidence regarding Erickson's mental condition and counsel's failure to contend that Erickson was not eligible for the death penalty – was prejudicial. The Illinois Supreme Court disagreed, stating that the proffered additional evidence – an affidavit from Erickson's brother stating that he thought that Fairweather killed Launer and affidavits from Erickson's former teachers – would not have changed things. The Illinois Supreme Court also rejected Erickson's claim that his counsel's failure to contest death-eligibility constituted ineffective assistance.

Next, Erickson again challenged Weliczko's testimony, this time by claiming that the trial court's reliance on that testimony and the accompanying written report deprived him of the right to be sentenced based on fair and reliable evidence. The Illinois Supreme Court disagreed, stating that the trial court was "well aware of Weliczko's shortcomings as a witness." *Erickson III*, 183 Ill.2d at 232-33. It also noted that the trial court considered Weliczko to be a lay witness only and did not attach significant weight to his testimony. Finally, it observed that the negative aspects of Weliczko's testimony – that Erickson was "manipulative, deceitful and misogynistic"

-18-

– were "amply established" by the circumstances surrounding Launer's murder and the other evidence in aggravation presented by the State. *Id.*

Finally, Erickson asserted that he had been unconstitutionally deprived of his right to receive a competent psychological evaluation in violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985). The Illinois Supreme Court found that *Ake* did not require the State to verify the credentials of a mitigation witness selected by a defendant and thus found that Erickson was not entitled to relief.

Again, Justice McMorrow (joined by Justice Harrison) dissented, stating that she believed that Erickson was entitled to an evidentiary hearing with respect to whether his trial counsel was ineffective in proffering Weliczko's testimony and report. She also noted that the record showed that the trial court did in fact consider Weliczko's testimony in connection with its decision to sentence Erickson to death.

## III.     Discussion

Erickson's § 2254 petition contains ten counts:

1.  The sentencing court's improper admonishment regarding Erickson's waiver of a jury for sentencing violated the Eight and Fourteenth Amendments;

2.  The State violated Erickson's Fourteenth Amendment due process rights when it presented testimony from Matthews (who had allegedly heard Erickson confess while they were both incarcerated) because it failed to disclose Matthews' extensive criminal history and failed to properly notify defense counsel that it planned to call Matthews as a witness at sentencing;

3.  Erickson's trial counsel's performance at sentencing was constitutionally ineffective because trial counsel (a) conceded Erickson's eligibility for the death penalty; (b) failed to conduct discovery regarding the State's aggravating evidence; (c) failed to investigate and present mitigating evidence; (d) failed to verify Weliczko's credentials and proffered a fraudulent, aggravating report from Weliczko; and (e) failed to deliver a closing argument at sentencing and left an

attorney with a minimal role in the case to deliver a closing argument with no preparation. In addition, the cumulative impact of trial counsel's errors deprived Erickson of his constitutional rights at sentencing;

4.  Erickson was denied his Eighth and Fourteenth Amendment rights to a competent mental health examination for sentencing purposes when the trial court denied his request for a continuance;

5.  Erickson was deprived of his Sixth, Eighth, and Fourteenth Amendment rights to a fair and reliable sentencing hearing;

6.  The trial court improperly failed to sua sponte order a competency hearing for Erickson during sentencing in violation of his due process rights under the Sixth and Fourteenth Amendments;

7.  At sentencing, the trial court improperly refused to consider sympathy for Erickson's parents in mitigation, in violation of Erickson's Eighth and Fourteenth Amendment rights;

8.  The state court's refusal to consider the evidence adduced during the state post-conviction proceedings relating to Weliczko's fraudulent credentials, coupled with trial counsel's failure to properly preserve this issue, deprived Erickson of his rights to a fair sentencing hearing and a competent evaluation by a legitimate mental health professional in violation of his rights under the Eighth and Fourteenth Amendments;

9.  Erickson's appellate counsel was constitutionally ineffective because he failed to argue on direct appeal that Erickson's counsel during sentencing was ineffective or that Erickson had been sentenced based on improper evidence; and

10.  The Illinois Death Penalty Act is unconstitutional.

## A.  Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this court must deny Erickson's petition for a writ of habeas corpus with respect to any claim adjudicated on the merits in a state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Lindh v. Murphy*, 96 F.3d 856, 879 (7th

Cir.1996), *rev'd on other grounds*, 521 U.S. 320 (1997). A state court decision is contrary to clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). In turn, a state court decision is an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of a particular prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1520.

"When the case falls under § 2254(d)(1)'s "contrary to" clause, we review the state court decision de novo to determine the legal question of what is clearly established law as determined by the Supreme Court and whether the state court decision is "contrary to" that precedent. When the case fits under the "unreasonable application of" clause of § 2254(d)(1), however, we defer to a reasonable state court decision." *Anderson v. Cowan*, 227 F.3d 893, 896-97 (7th Cir.2000) (internal citations omitted).

In other words, the court reviews core issues of federal law *de novo*. *Lindh v. Murphy*, 96 F.3d at 877. When confronted with mixed constitutional questions of law and fact (*i.e.*, whether a state court's holding involved an "unreasonable application" of clearly established Supreme Court precedent) we also use the *de novo* standard but "with a grant of deference to any reasonable state court decision." *Anderson v. Cowan*, 227 F.3d at 897. A state court satisfies this reasonableness standard if its application is "at least minimally consistent with the facts and

-21-

circumstances of the case." *Spreitzer v. Peters*, 114 F.3d 1435, 1442 (7th Cir. 1997); *see also Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.1997) (same). With these standards in mind, the court turns to Erickson's § 2254 petition.

## B. Erickson's Waiver of a Sentencing Jury

The court begins by evaluating Erickson's waiver of a sentencing jury, as the remainder of his sentencing claims relate to decisions by the sentencing judge. As noted above, Erickson mounts three attacks with respect to his waiver of a sentencing jury: (1) the sentencing judge's failure to specifically advise him of Illinois' one-juror rule renders his waiver invalid; (2) the sentencing judge's misleading admonishment caused him to unknowingly waive his right to a sentencing jury; and (3) Erickson's counsel's failure to instruct him on Illinois' one-juror rule renders his waiver invalid.[4]

Erickson does not point to any Supreme Court authority which requires a sentencing judge to specifically alert a capital defendant to the one-juror rule. Morever, although the Seventh Circuit has declined to determine if the Constitution requires a capital defendant to be advised regarding the unanimity requirement, *St. Pierre v. Cowan*, 217 F.3d 939, 951 (7th Cir. 2000) (applying pre-AEDPA law), several district courts have found that it does not impose such a requirement, *United States ex. rel. Henderson v. Page*, No. 97 C 1079, 2000 WL 1466204 *20 (N.D. Ill. 2000), and *United States ex rel. v. Page*, 2000 WL 343209 *17-18 (N.D. Ill. 2000).

---

[4] The Illinois "one-juror rule" applies if a defendant opts for a sentencing jury. It provides that the entire jury must render a unanimous verdict in order to impose the death penalty. Conversely, if the entire jury does not unanimously agree on the death penalty, then death may not be imposed. *U.S. ex rel. Whitehead v. Page*, — F.3d —, No. 00-2091, 2001 WL 985744 *18-19 (7th Cir. Aug. 29, 2001).

Here, although the sentencing court advised Erickson of the unanimity requirement, Erickson claims that the admonishment confused him and caused him to waive a sentencing jury. Affirmatively misleading a defendant about the one-juror rule can invalidate a defendant's waiver of his right to a capital sentencing jury. *Enoch v. Gramley,* 70 F.3d 1490, 1506 (7th Cir.1995); *St. Pierre v. Cowan,* 217 F.3d at 951.[5]

Thus, in *Enoch v. Gramley,* the trial court told the defendant that, "in order for the death penalty to be imposed, the jury had to return unanimous verdicts in favor of the death penalty at each stage of the proceedings." 70 F.3d at 1506. The Seventh Circuit court held that this admonishment was unambiguous because "[t]here were only two possible decisions for the jury: impose the death penalty or decline to impose it." *Id.* The court then concluded that, because the defendant said he understood the admonishment, he was bound by it. *Id.*

In *St. Pierre v. Cowan,* the trial court told the defendant that, "both as to eligibility and as to *death or no death,* you'd be entitled to have 12 people make that decision, and it would have to be unanimous of all the 12 people. " 217 F.3d at 951 (emphasis in original). The defendant claimed that this left him with the erroneous impression that only a unanimous jury could prevent him from receiving (as opposed to imposing) death sentence. The Seventh Circuit agreed, and held that the admonition was misleading, as a statement that unanimity was required as to "death and no death," could make it seem that unanimity was required to avoid a death sentence. *Id.* at 94-95; *see also Hall v. Washington,* 106 F.3d at 753 (defendant's waiver of

---

[5] These cases obviously do not represent established Supreme Court precedent so the state court's alleged failure to follow them cannot support a grant of habeas relief. *See* 28 U.S.C. § 2254(d)(1). Nevertheless, the court will discuss the cases cited by the parties in the interests of completeness.

capital sentencing jury was invalid where defense counsel misrepresented the one-juror rule by stating that, "unanimity would be necessary and required in a jury setting").

So was the admonishment in this case misleading? Despite Erickson's vigorous attempts to analogize his admonishment to the one in *St. Pierre v. Cowan*, the answer to this question is "no." The court asked Erickson if he understood "that the verdicts of the jury in the case of determining whether or not the death penalty would be imposed must be a unanimous verdict just as their verdict as to your guilt or innocense [sic] had to be a unanimouse [sic] verdict?" and noted that this meant that "all twelve jurors must conclude that the punishment should be death before the death penalty could be imposed . . . " (R. 2022-23).

This admonition is analogous to the admonition in *Enoch* because the court told Erickson that "all twelve jurors must conclude that the punishment should be death before the death penalty could be imposed . . . . " *Id.* It is true that the judge also told Erickson that "the verdicts of the jury in the case of determining whether or not the death penalty would be imposed must be a unanimous verdict." However, the subsequent immediate clarification of what that meant – that all twelve jurors needed to agree to the death penalty in order for Erickson to receive a death sentence -- means that it would have been unreasonable for Erickson to conclude that unanimity would be required to both receive and avoid the death penalty. *See St. Pierre v. Cowan*, 217 F.3d at 950-51 (construing the admonition in *Enoch*); *U.S. ex rel. Whitehead v. Page*, 2001 WL 985744 at *18-19. In short, this court finds that the admonition fails to demonstrate that Erickson's waiver was not knowing and intelligent.

Erickson's claim that his counsel failed to instruct him on Illinois' one-juror rule does not affect this conclusion. The Constitution does not provide "that an accused person cannot

waive [trial] by jury, no matter how freely and understandingly he surrenders that right, unless he acts on a lawyer's advice." *Adams v. McCann*, 317 U.S. 269, 278-9 (1942). The trial court explained the basics of the one-juror rule to Erickson, who, in the presence of his attorney, affirmatively stated that he understood his rights when he waived a sentencing jury. Erickson thus cannot escape the consequence of this knowing and voluntary waiver by claiming that his counsel did not also advise him regarding the one-juror rule.

Coming at the admonishment from another angle, Erickson also attempts to demonstrate that, but for the misstatements of the judge and his counsel's failings, he would not have waived his right to a sentencing jury, and that jury would not have sentenced him to death. In support, Erickson presents a juror's affidavit stating that, "the jury did not think that Paul Erickson was the person who stabbed the victim, Elizabeth Launer, on the night of her murder." (12/12/95 H. Hunley Aff. ¶ 4 (Am. App. Ex. 15)). It is well settled, however, that a defendant cannot use juror statements to challenge a jury verdict. *See, e.g., Gosier v. Welborn*, 175 F.3d 504, 510-11 (7th Cir. 1999); *Silagy v. Peters*, 905 F.2d 986, 1008-9 (7th Cir. 1990); *People v. Hobley*, 182 Ill.2d 404, 456-58 (Ill.1998). Therefore, we find that the Illinois Supreme Court's denial of relief as to Erickson's waiver of a sentencing jury was not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

## C.  Ineffective Assistance of Counsel at Sentencing

Erickson next raises a plethora of claims regarding his attorneys' allegedly ineffective performance during sentencing. To prevail on his ineffective assistance claims, Erickson must establish that: (1) his attorney's representation fell below an objective standard of

reasonableness; and (2) his attorney's errors were so serious as to deprive him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 688-689 (1984).

With respect to the performance prong of *Strickland*, there is a strong presumption that counsel's performance was adequate. *Williams v. Washington*, 59 F.3d 673, 679 (7th Cir. 1995). The deference given to counsel's strategic decision-making is evaluated from counsel's perspective at the time the decisions were made. *Strickland v. Washington*, 466 U.S. at 689-91. In turn, the prejudice prong of *Strickland* requires Erickson to show "that a reasonable probability exists that, but for counsel's substandard performance, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Ashford v. Gilmore*, 167 F.3d 1130, 1135 (7th Cir. 1999); *Hall v. Washington*, 106 F.3d at 479. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," *Strickland v. Washington*, 466 U.S. at 679, and "only a clear error in applying *Strickland*'s standard would support a writ of habeas corpus," *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997); *Porter v. Gramley*, 112 F.3d 1308, 1312-14 (7th Cir. 1997).

We will begin with Erickson's challenge in Counts III(d), VIII & IX to his lawyer's use of Weliczko at sentencing. Erickson claims that: (1) his trial counsel's failure to check Weliczko's background constituted ineffective assistance (Count III(d)); (2) the Illinois Supreme Court's finding that Erickson was required to raise his claims regarding Weliczko on direct appeal and his trial lawyer's failure to preserve this issue prevented Erickson from receiving a fair sentencing hearing or a competent evaluation by a legitimate mental health professional (Count VIII); and (3) his appellate counsel was ineffective because he failed to argue on direct

appeal that Erickson's counsel during sentencing was ineffective or that Erickson had been sentenced based on improper evidence (Count IX).[6]

In response, the Respondent contends that Erickson defaulted his first two Weliczko claims by failing to raise them on direct appeal and asserts that the Illinois Supreme Court's conclusion to this effect, *Erickson II*, 161 Ill.2d at 88-91, represents an adequate, independent state ground of decision barring review by this court. With respect to Erickson's final recasting of his Weliczko claim -- that his default should be excused because his appellate lawyer was ineffective for failing to raise this issue on direct appeal -- the Respondent submits that Weliczko's testimony was not prejudicial. The Respondent then concludes that, if Erickson was not prejudiced, his appellate counsel could not have been ineffective for failing to raise the issue. The court will begin by examining, in detail, the Illinois Supreme Court's opinions regarding Weliczko.

### 1.    Illinois Supreme Court Decisions

In Erickson's first state post-conviction appeal, the Illinois Supreme Court stated that:

> It was intended that Weliczko would give his opinion as a mental health expert that a psychological condition explained defendant's criminal behavior. *See* Ill. Rev. Stat., ch. 38, ¶ 9–1(c)(2) (1989); *Erickson*, 117 Ill.2d at 285, 301. Weliczko did testify as to what might have accounted for defendant's acts. But he did so as a lay person, the trial judge having refused to qualify him as an expert . . . . There was good reason for this.  In relating his credentials, Weliczko had stated that he held a masters degree in psychology from Harvard University and a doctorate in the field from the University of Chicago. Weliczko, in fact, was not trained in psychology.

---

[6] With respect to this argument, it must be remembered that Erickson had the same lawyer for his trial, direct appeal, first state post-conviction petition, and the appeal from the denial of collateral relief. Thus, it was proper for him to file a second state post-conviction petition asserting ineffective assistance of counsel on direct appeal.

* * * *

The misrepresentation of professional credentials would be a serious concern but for the fact that Weliczko was retained by, and testified for, the defense, not the State. But the claim is even more fundamentally flawed: whatever effect Weliczko's testimony might have had was apparent when his credentials were challenged on cross-examination. The opportunity to take issue with Weliczko's testimony was therefore on direct appeal, not in a collateral attack in a post-conviction proceeding.

Failure to raise a claim which could have been addressed on direct appeal is a procedural default which results in a bar to consideration of the claim's merits in a post-conviction proceeding. *People v. Albanese*, 125 Ill.2d 100, 104-05 (Ill. 1988). Excused in limited circumstances, *see People v. Flores*, 153 Ill.2d 264, 274 (Ill. 1992), the result of a procedural default forces acknowledgment of a conviction's finality, an elemental concern in any such proceeding. *See People v. Free*,122 Ill.2d 367, 378 (Ill. 1988).

Defendant attempts to skirt the procedural bar under an exception that looks to matters that were not a part of the record on direct appeal. He points to a copy of Weliczko's transcript from the Chicago Theological Seminary and an affidavit of an official at Gordon College in Wenham, Massachusetts, which shows Weliczko earned a degree in philosophy there. Defendant concedes the State debunked Weliczko's assertion that he was a psychologist. But he insists a different injurious "perjury" is shown by the affidavit and documents: that is, Weliczko lied about actually holding a degree in the field of psychology.

The argument glosses over the reason why the procedural bar properly may be relaxed given matters outside the trial record. The bar normally reaches to all matters that could have been – not merely were not – earlier raised. Thus, the mere fact that support for a claim is contained in papers not in the trial record is largely immaterial. Reason to relax the bar occurs only when what is offered in the papers also explains why the claim it supports could not have been raised on direct appeal.

There is nothing in the content of the affidavit and documents here offering more than what is evident from the record itself. The issue of prejudice resulting from Weliczko's testimony could have been raised on direct appeal based on the testimony elicited during the sentencing hearing. Weliczko had admitted that his academic background was in theology and ministry and that, in fact, he was not a psychologist. The admissions were fixed in the record as a result of the cross-examination. The affidavit and documents reveal no more

than Weliczko's own testimony. Finding no reason to excuse the procedural default, defendant's claim must be dismissed.

*Erickson II*, 161 Ill.2d at 85-88.

In Erickson's second state post-conviction appeal, the Illinois Supreme Court again confronted the Weliczko issue. First, it addressed Erickson's claim that his trial counsel's use of Weliczko as a mitigation witness and his failure to investigate and present additional mitigating evidence relating to Erickson's mental and emotional condition constituted ineffective assistance. Explaining that Erickson had already unsuccessfully raised this claim in this first state post-conviction petition, it concluded that this claim was "procedurally barred under the principles of res judicata set forth in *People v. Flores*, 153 Ill.2d 264 (1992)." *Erickson III*, 183 Ill.2d at 224.

Second, the court considered Erickson's claim that his appellate counsel was ineffective because he failed to raise the Weliczko issue on direct appeal and thus procedurally defaulted that claim. The Illinois Supreme Court held that consideration of this claim in a second state post-conviction claim was proper because the same attorney represented Erickson on direct appeal and in his first state post-conviction appeal. *Id.* at 228. However, it rejected the claim, finding that Erickson had failed to establish prejudice. *Erickson III*, 183 Ill.2d at 224-229.

## 2. Ineffectiveness of Trial Counsel – Weliczko's Testimony and Report

As noted above, the Illinois Supreme Court found that Erickson's claim that his trial lawyer dropped the ball regarding Weliczko was procedurally barred because Erickson failed to raise this issue on direct appeal. *See Erickson II*, 161 Ill.2d at 87 ("whatever effect Weliczko's testimony might have had was apparent when his credentials were challenged on cross-examination" so raising this claim collaterally resulted in procedural default); *Erickson III*, 183

Ill.2d at 224 (Erickson's claim based on his lawyer's alleged failure to investigate and present mitigating evidence was raised and rejected in his first state post-conviction petition and is therefore barred by res judicata").

We agree. The fact that Weliczko was a fraud was apparent at the time of his cross-examination, when he admitted that: (1) he did not hold a masters degree in psychology from Harvard University or a doctorate in psychology from the University of Chicago as he had claimed; (2) he had instead received a masters degree in theology from the Harvard Divinity School and a ministry degree in pastoral counseling and psychology from the Chicago Theological Seminary; (3) he did not have any degrees in psychology or any medical training; and (4) he had previously only testified as a pastoral counselor. (R. 2365).

As a general rule, a claim of ineffective assistance of counsel is waived by failure to raise it on direct appeal only if the claim is based entirely on evidence in the trial record. *See, e.g., Stoia v. United States,* 22 F.3d 766, 768 (7th Cir.1994). Thus, if a defendant wishes to use evidence outside the record to demonstrate that his lawyer was ineffective, he may wait and present that claim in a collateral attack. *Id.* Here, however, the evidence outside the record proves something already established. Erickson could have challenged his counsel's decisions vis-a-vis Weliczko on direct appeal but failed to do so. That he was able to subsequently obtain additional evidence regarding Weliczko's lack of credentials does not excuse his failure to raise this claim earlier based on the ample evidence in the record regarding this very issue.

Moreover, a defendant cannot avoid the effect of failing to raise a claim on direct appeal by adducing additional evidence in support of a claim which could have been resolved based on evidence already in the record. As the Seventh Circuit recently remarked, adding detail to a

claim does not necessarily transform that more detailed claim into a new claim. *Boyko v. Parke*, 259 F.3d 781, 788-89 (7th Cir. 2001). The new evidence here adds detail to the trial record, as opposed to supporting a distinct and fundamentally different claim. *See id.*

Accordingly, we conclude that the additional evidence which supports the established fact that Weliczko was a fake did not excuse Erickson's failure to raise this claim on direct appeal. We thus agree with the Illinois Supreme Court that Erickson defaulted his claim of ineffective assistance of trial counsel regarding Weliczko's testimony and report.

The court also rejects Erickson's claim that this claim is not defaulted because the state courts considered whether the use of Weliczko's testimony and report was prejudicial. The Illinois Supreme Court found that Erickson had procedurally defaulted his claim that his trial counsel's use of Weliczko was ineffective and did not reach the merits of this claim in the alternative. *Erickson II*, 161 Ill.2d at 87-88. Its consideration of whether the use of Weliczko was prejudicial occurred when it addressed an entirely different issue: whether appellate counsel was ineffective for failing to raise this issue on direct appeal. *Erickson III*, 183 Ill.2d at 228-29. The Illinois Supreme Court thus did not overlook the procedural default vis-a-vis trial counsel. *See U.S. ex rel. Bell v. Pierson*, No. 00-4296, — F.3d —, 2001 WL 1029282 *9 (7th Cir. Sept. 10, 2001) (federal review of a claim is permissible where the state court reached the merits despite the existence of a state procedural bar). Its consideration of whether appellate counsel's failure to raise the Weliczko issue was prejudicial does not resurrect the defaulted trial counsel claim.

Accordingly, Erickson's ineffective assistance of trial counsel claim is procedurally defaulted. Erickson nevertheless asserts that ineffective assistance from his appellate counsel

constitutes cause and prejudice to excuse his default. We thus turn to Erickson's second state post-conviction petition and his challenge to his appellate counsel's performance on direct appeal.

### 3. Ineffectiveness of Appellate Counsel – Weliczko's Testimony and Report

Erickson is entitled to relief only if his appellate lawyer's performance was "unreasonably deficient" and "this inadequacy prejudiced him in the sense that there is a reasonable probability. . . that the decision of the state trial court would have been otherwise modified on appeal." *Howard v. Gramley*, 225 F.3d 784, 790 (7th Cir. 2000); *see also Schaff v. Snyder*, 190 F.3d 513 (7th Cir. 1999). Where a defendant claims that counsel failed to raise the correct issues on appeal, the question is whether appellate counsel failed to raise a significant and obvious issue without a legitimate strategic purpose. *Franklin v. Gilmore*, 188 F.3d 877, 884 (7th Cir. 1999). Thus, we must examine the "trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir.1996).

Here, Erickson argues that his appellate counsel for his direct appeal improperly failed to challenge trial counsel's use of Weliczko's testimony and report, contending that Weliczko not only was a fraud but also undermined his defense by portraying him as manipulative, aggressive and violent. Nothing in the record explains why this issue was not raised on direct appeal. It is clear, however, that Erickson's trial counsel believed he had made a major blunder in calling

Weliczko. *See* Pet. Ex. 10. In an affidavit executed in 1989, Glenn Seiden, Erickson's trial counsel stated that he was "completely surprised" that Weliczko was not a mental health professional and that Weliczko's lack of qualifications was "devastating." *Id.* He also stated that "Weliczko's exposure as a fraud on the stand during the sentencing hearing was one of the worst moments of his professional career." *Id.* In addition, he admitted he feared he could be disbarred for not verifying Weliczko's credentials, and that he knew he should have "just picked up the phone" and done so. *Id.*

So, was the decision not to raise the Weliczko claim on direct appeal both professionally unreasonable and prejudicial? *See Franklin v. Gilmore*, 188 F.3d 877, 884 (7th Cir. 1999). The Illinois Supreme Court did not consider whether appellate counsel's failure to raise this issue on direct appeal met the constitutional minimum because it found that trial counsel's actions with respect to Weliczko were not prejudicial. *Erickson III*, 183 Ill.2d at 228-29. In other words, it found that, because trial counsel's representation did not prejudice Erickson, appellate counsel's failure to raise the Weliczko issue on direct appeal did not make counsel's representation constitutionally ineffective. We disagree.

First, the Illinois Supreme Court's finding of no prejudice was based on its conclusion that it was "unlikely the trial court would have drawn any different conclusion [regarding Erickson's sentence] even if Weliczko had not testified." *Erickson III*, 183 Ill.2d at 229. The prejudice element of *Strickland*, however, requires a defendant to establish that there is a "reasonable probability that . . . the result of the proceeding would have been different" and "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is

reliable." 466 U.S. at 687, 693-94. We find that the Illinois Supreme Court's use of the "unlikely" standard does not satisfy *Strickland*'s "unreasonable" standard.

Webster's defines "unlikely" as "improbable, unbelievable . . . . seemingly lacking in any prospect of success." Webster's Third New International Dictionary, Unabridged at 2503 (1986). On the other hand, the Supreme Court defines a "reasonable" probability as a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. Importantly, according to the Supreme Court, a defendant need not show that "counsel's deficient conduct more likely than not altered the outcome in the case" in order to satisfy the reasonableness standard. 466 U.S. at 693-94.

The Illinois Supreme Court was clearly aware of the *Strickland* standard, as references to *Strickland* appear repeatedly in its opinion. Nevertheless, its use of the "unlikely" standard with respect to the Weliczko issue appears to hold Erickson to a higher standard than *Strickland* requires. "[A] state court acts contrary to clearly established federal law if it applies a legal rule that contradicts [the Supreme Court's] prior holdings." *Ramdass v. Angelone*, 120 S.Ct. 2113, 2119-20 (2000). The use of the "unlikely' standard instead of *Strickland*'s unreasonable standard thus sets this case apart from "run-of-the-mill state-court decision[s] applying the correct legal rule from our cases to the facts of a prisoner's case" and triggers § 2254(d)(1)'s "contrary to" clause. *See Williams v. Taylor*, 529 U.S. at 362.

The court acknowledges that it is possible that the Illinois Supreme Court's use of the word "unlikely" was simply an unfortunate word choice and that the Illinois Supreme Court in fact applied *Strickland* to the Weliczko claim, as it did to other claims. In that instance, the state court would have applied the proper rule, so even if this court would not have independently

reached the same result (a question which we do not reach), the federal court cannot grant relief based on the "contrary to" clause. *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000). The court declines to give the Illinois Supreme Court the benefit of the doubt, given its invocation of a seemingly more demanding "unlikely" standard and its failure to mention *Strickland* or its reasonableness standard in this portion of its opinion. *See generally Simmons v. South Carolina*, 512 U.S. 154, 172 (1994) (Souter, J., concurring) (collecting cases holding that the Eighth Amendment imposes a heightened standard for reliability in the determination that a death sentence is appropriate).

Of course, since the Illinois Supreme Court found that Erickson did not meet the more demanding "unlikely" standard, it is clear that it would not have found that he had satisfied the less rigorous reasonable standard. The court will not consider whether the lack of prejudice arising from the application of an incorrect legal rule is enough to support the grant of habeas relief because Erickson can also find succor in the "unreasonable application" prong of §2254(d). Specifically, as discussed more fully below, he has established that the state court clearly erred in its application of *Strickland* and that his counsel's errors render his sentence suspect. *See Ashford v. Gilmore*, 167 F.3d 1130, 1134-35 (7th Cir. 1999), *citing Strickland*, 466 U.S. at 687, and *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1994).

The court will first consider whether Erickson's trial attorney was minimally competent (an issue not considered by the Illinois Supreme Court, as it found that counsel's representation during sentencing was not prejudicial). First, Weliczko was the defense's only witness during sentencing and, due to counsel's failure to conduct even a cursory investigation of his star witness or to interview him prior to trial, Weliczko was destroyed on cross-examination. "The

failure to investigate a particular lead may be excused if a lawyer has made a 'reasonable decision that makes particular investigations unnecessary." *Washington v. Smith*, 219 F.3d 620, 631 (7th Cir. 2000), *quoting Strickland*, 466 U.S. at 691. The court agrees with Erickson that counsel's failure to ensure that his sole witness was legitimate was objectively unreasonable. *See People v. Cornille*, 95 Ill.2d 497, 514 (Ill. 1983) ("it is obvious that every party . . . has an obligation to verify the credentials of its expert witnesses"); *see also U.S. ex rel. Hanna v. McGinnis*, No. 90 C 7004, 1991 WL 203806 *6 (N.D. Ill. Oct. 4, 1991) (declining to find that counsel rendered ineffective assistance when he failed to verify the credentials of an expert because an expert referral service supplied the expert and the absence of the expert's testimony did not leave the petitioner without any evidence to support his defense) .

The Respondent asserts that it was reasonable for counsel not to look into Weliczko's background because Erickson's family retained Weliczko. It is true that counsel is entitled "to place a certain reliance on his client." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998). For example, if a client's family denies the existence of psychological problems that might have supported an additional theory of mitigation, a lawyer cannot be faulted for a failure to further investigate that defendant's psychological background. *See id.*

The court, however, declines to extend this principle and hold that it is always reasonable for an attorney not to check up on an expert located by a defendant's family and not to interview that witness prior to trial. In a death penalty case, minimally competent representation requires a defendant to conduct a reasonable investigation into potential mitigating evidence. *Strickland*, 466 U.S. at 691; *Williams v. Taylor*, 529 U.S. at 395-96. Because trial counsel did not verify Weliczko's credentials or interview him regarding his trial testimony and report, we find that

counsel could not have made a strategic decision to use Weliczko, in that a strategic decision necessarily rests on knowledge about what a witness will say and the pros and cons of presenting that testimony. *U.S. ex rel. Maxwell v. Gilmore*, 37 F. Supp.2d 1078, 1091 (N.D. Ill. 1999) (the "failure to interview witnesses before they testified is of course the antithesis of any strategic decisions on the part of counsel. Counsel could hardly have had a 'strategy' if they did not know what the witnesses were going to say").

We also acknowledge that Erickson was only entitled to a professionally competent defense, not the best possible defense. *See Holman v. Gilmore*, 126 F.3d at 883. Counsel's decision to use Weliczko as the entire base of Erickson's position at sentencing without verifying his credentials, however, makes this case factually similar to those where counsel put on no defense or failed to conduct any investigation. *See id.* (collecting cases). The scope of mitigation evidence at sentencing is broader than the range of relevant information used to determine culpability. *See* 720 ILCS § 5/9-1 (c) & (e). The breadth of potentially mitigating evidence means that counsel is under a greater obligation to discover and evaluate potential mitigating evidence, especially during a capital sentencing hearing. *See Penry v. Lynaugh*, 492 U.S. 302, 317-18 (1989); *Emerson v. Gramley*, 883 F. Supp. 225, 242-43 (N.D. Ill. 1995), *aff'd by* 91 F.3d 898 (7th Cir. 1996). Blindly putting on a single witness at a capital sentencing hearing does not satisfy this obligation.

It is true that counsel had Weliczko's report prior to sentencing. The presence of the report, however, did not obviate the need to verify Weliczko's credentials or to ascertain what Weliczko would say at sentencing. A capital sentence may only be imposed on a case-by-case basis according to an individualized assessment of the defendant's characteristics and the

circumstances of the crime. *See Zant v. Stephens*, 462 U.S. 862, 879 (1983). Here, portions of Weliczko's report indicated that Weliczko's testimony would not be wholly favorable to Erickson. *See* R. 2673-75. Aside from counsel's failure to learn that Weliczko was a fraud, when faced with a report describing a client facing the death penalty as "manipulative" and "narcissistic" with a "grandiose sense of self-importance," "feelings of entitlement," "lack of empathy for the pain of others," and a preoccupation with sexual fantasies of women, a minimally competent attorney would have interviewed the witness prior to trial to determine whether to place that witness on the stand. (R. 2673). *Cf. Foster v. Schomig*, 223 F.3d 626, 634-35 (7th Cir. 2000) (defense counsel acted reasonably in deciding not to call a psychiatrist who opined that the defendant had "an antisocial personality disorder" with "pronounced tendencies towards explosive anger and aggressive physical outbursts").

It is also true that another psychiatrist, Dr. Bogen, had previously examined Erickson on behalf of the State. Dr. Bogen spoke with Erickson for approximately an hour and concluded that he was fit for trial, sane at the time of the offense, and not suffering from a mental defect or disease. (R. 2429-32). This evaluation, however, was expressly limited to Erickson's fitness for trial and sanity at the time of Launer's death, and did not address the statutory mitigating factors of extreme mental or emotional distress. (R. 2429-30). Dr. Bogen's report thus did not excuse counsel's deficiencies with respect to Weliczko.

It would have been within the range of reasonably competent counsel for Erickson's trial lawyer to look into and then decide to present a qualified expert whose testimony supported counsel's theory that Erickson was laboring under an extreme mental or emotional disturbance when he murdered Launer. This is, however, not what happened. Erickson's lawyer had no idea

whether Weliczko was qualified and Weliczko's written report gave him, at best, only a general idea of his testimony (much of which was potentially damaging). The record shows that counsel did not make a strategic decision to make Weliczko the linchpin of the defense theory; he simply forged blindly ahead. The Constitution requires a lawyer to do more than roll the dice and hope for the best, especially during a capital sentencing hearing.

All of this is, of course, irrelevant if counsel's shortcomings did not prejudice Erickson. The Illinois Supreme Court found that the decision to use Weliczko was not prejudicial, stating that:

> Defendant contends that Weliczko's testimony and his written report undermined the defense by portraying defendant as manipulative, aggressive and violent. While Weliczko's negative characterization of defendant may not have helped the defense, it did not contribute to the trial court's sentencing decision. The trial court explained in detail the aggravating factors forming the basis for its decision, but made no reference to Weliczko's testimony or written report. Rather, in sentencing defendant to death the court relied on its conclusions that defendant had devised the plot to abduct, rape and murder Elizabeth Launer and that he produced the necktie with which she was bound, the sock with which she was gagged, and the knife with which she was killed. The court emphasized the heinous nature of the crime, observing that the victim was "stripped, tied, gagged, subjected to the most ultimate indignity that could be forced upon a female and then executed in a brutal and savage attack," that defendant ignored the victim's pleas for mercy, and that defendant later boasted about the crime. The court also cited defendant's prior history of sexual attacks against women.
>
> The trial court did briefly refer to Weliczko's testimony in its summary of mitigating evidence. While the trial court may not have given the evidence great weight in mitigation, it does not appear that the court considered the evidence to be aggravating. Moreover, regardless of the opinions Weliczko offered, the circumstances of the crime and the other aggravation evidence presented by the State clearly portrayed defendant as calculating, aggressive and violent. It is unlikely the trial court would have drawn any different conclusion even if Weliczko had not testified. Thus defendant suffered no prejudice due to the counsel's use of Weliczko as a mitigation witness.

*Erickson III*, 183 Ill.2d at 224-229.

The Respondent submits that the use of Weliczko and his report was not prejudicial because: (1) Weliczko testified to mitigating circumstance which could only have helped Erickson; (2) the negative descriptions of Erickson in Weliczko's report were independently supported by other evidence adduced at trial and during the sentencing hearing; (3) the trial court was aware that Weliczko was not a qualified mental health professional.

We begin by noting that the essence of the Illinois Supreme Court's finding of no prejudice was its belief that it was unlikely the trial court would have sentenced Erickson differently if Weliczko had not testified. *Erickson III*, 183 Ill.2d at 229. In other words, the Illinois Supreme Court posited that, if Weliczko had not testified, Erickson would still have been sentenced to death. Considering the issue as framed by the Illinois Supreme Court, we agree. Weliczko was the only witness presented at sentencing. Without Weliczko, Erickson had no mitigating evidence whatsoever. Given that Illinois requires that the death penalty "shall" be imposed in the absence of mitigating evidence, Ill. Rev. Stat., Ch. 38, ¶ 9-1(h) (1983), it is difficult to see how removing Weliczko from the sentencing equation but leaving everything else the same could have helped Erickson.

But *Strickland* requires more than simply removing Weliczko from the equation. To conduct a proper prejudice analysis, the Illinois Supreme Court needed not only to ignore Weliczko's evidence but also needed to consider the evidence that a minimally competent attorney would have presented in its place and weigh that hypothetical defense against the evidence presented in aggravation. 466 U.S. at 696; *Williams v. Taylor*, 529 U.S. at 397-98 (a state court making a prejudice determination must "evaluate the totality of the mitigation

-40-

evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation"). This clearly did not occur during Erickson's second state post-conviction proceeding, when this issue was squarely in front of the Illinois Supreme Court.

The Illinois Supreme Court did, however, consider mental health evidence in the course of Erickson's first state post-conviction proceedings. Specifically, Erickson presented reports from two psychologists. *See Erickson II*, 161 Ill.2d at 89; Report of Dr. Michael Gelbort (Erickson Ex. 6); Report of Dr. Brad Fisher (Erickson Ex. 7) . The reports showed that he had been dropped on his face as a baby and suffered repeated head traumas growing up which resulted in an alteration of consciousness, dizziness, headaches, and spells of blurred vision and unconsciousness; he endured a childhood of psychological and emotional abuse; grew up with a schizophrenic mother and was sexually abused by a priest as a child; attempted to commit suicide as a teenager, had a history of significant alcohol and drug addiction beginning in his early teen years; and had brain damage in the dominant cerebral hemisphere caused by the head traumas and substance abuse which affected his ability to make decisions, control his actions and make reasonable judgments.

The Illinois Supreme Court acknowledged that these reports "could, at best, only suggest what explained defendant's criminal behavior." *Erickson II*, 161 Ill.2d at 91. This is, of course, exactly what Weliczko, a supposed mental health professional, was meant to do during sentencing: explain Erickson's behavior in a way that supported a conclusion that Erickson was acting under extreme emotional or mental distress. The Illinois Supreme Court nevertheless concluded that consideration of this evidence would not have been reasonably likely to affect

Erickson's sentence, "[a]ny laxity of counsel notwithstanding," because the reports were produced long after the trial and the trial judge "took into account the notion that defendant might have suffered from a personality disorder." *Id.* at 91-92.

Expert testimony presented collaterally does not lose all of its weight simply because it was produced after the fact. By definition, evidence adduced during collateral proceedings will not be as timely as evidence adduced during direct proceedings. As the Seventh Circuit has noted, however, "[t]he big question is not whether [the defendant's] current legal team has found a good witness; it is whether his former lawyers should have . . . conducted an appropriate investigation in order to obtain evidence at sentencing." *Kokoraleis v. Gilmore*, 131 F.3d 692, 697 (7th Cir. 1997). In other words, the relevant inquiry hinges on what counsel should have done at sentencing, not the timeliness of expert testimony which necessarily would have to be produced after the fact.

Moreover, the fact that the trial judge "took into account the notion" that Erickson may have had a personality disorder does not mean that expert psychological testimony regarding Erickson's mental health would not have been reasonably likely to have affected his sentence. *See Erickson II*, 161 Ill.2d at 92. "Evidence is cumulative when it 'supports a fact established by existing evidence.'" *Washington v. Smith*, 219 F.3d at 634, *quoting* Black's Law Dictionary 557 (7th ed. 1999). The expert testimony could not have been cumulative, in that Weliczko was no expert and the two expert reports contained extensive histories and diagnoses which were not included in Weliczko's report and in fact were inconsistent with it.

The court is also unpersuaded by the Respondent's argument that, because Weliczko testified to mitigating circumstances, his testimony by definition must have helped Erickson and

thus could not have affected the trial judge's sentencing decision. While Weliczko testified that Erickson had some form of narcissistic or neurotic personality disorder, (R. 2390-96), his testimony did not cast Erickson in a favorable light.

It also did not support a finding that Erickson was under an "extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." *See* Ill. Rev. Stat. ch. 38, ¶¶ 9-1(c)(1) & (2) (1981). Specifically, the Illinois Supreme Court acknowledged that, at best, the sentencing court considered that Erickson "may have suffered from a personality disorder." *Erickson II*, 161 Ill.2d at 92. It thus is unclear whether the court did, in fact, consider Weliczko's lay mental health evidence.

Moreover, testimony to the effect that Erickson was raised in a supportive home and had a personality disorder which allowed him to function normally, albeit with a grandiose sense of self-importance and a need for attention, is not mitigating. (R. 2377, 2392-93). In contrast, the two psychologists' reports detailed Erickson's history and its impact on his mental capacity and used this information to explain Erickson's behavior and mental state. *See Erickson II*, 161 Ill.2d at 92.

Therefore, even if the sentencing court "took into account the notion that [Erickson] may have suffered from a personality disorder," it would not necessarily inure to Erickson's benefit. *See id*. The personality disorder described by Weliczko did not rise to the level of an extreme mental and emotional disturbance, may not have even been considered as even lay mental health evidence, and did not address the statutory mitigating factors. This left Erickson for all practical purposes without any evidence in mitigation. Because we cannot say with confidence that Erickson's subsequently obtained mental health evidence would not have changed the state

court's decision to impose the death sentence, we must find that Erickson was prejudiced by his counsel's shortcomings with respect to Weliczko.

The court also disagrees with the Respondent's contention that the negative descriptions of Erickson in Weliczko's report were independently supported by other evidence and hence could not have been prejudicial. This argument misses the point. The question is whether there is a "reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." *Williams v. Taylor*, 529 U.S. at 399 (internal citations omitted). The fact that other witnesses negatively described Erickson thus fails to establish that Weliczko's testimony was not prejudicial under *Strickland.*

The fact that the trial court knew that Weliczko was not a qualified mental health professional similarly does not show that the Illinois Supreme Court's application of *Strickland* was reasonable. On the one hand, the Illinois Supreme Court acknowledged that while Weliczko's testimony "may not have helped the defense," the problems associated with the use of that testimony could not have been prejudicial because Weliczko's testimony "did not contribute to the trial court's sentencing decision." *Erickson III*, 183 Ill.2d at 228. On the other hand, the Illinois Supreme Court noted that the trial court expressly referred to Weliczko's testimony when it summarized the mitigating evidence at sentencing. *Id.* at 229; R. 2502, 2505.

The Illinois Supreme Court' s finding that the sentencing court did not rely on Weliczko's testimony is thus contradicted by the record. Accordingly, it cannot be a reasonable determination of the facts in light of the evidence presented at sentencing. *See* 28 U.S.C. §2254(d)(2); *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997) (the test for reasonableness is

"whether the [state court's] determination is at least minimally consistent with the facts and circumstances of the case"); *Hall v. Washington*, 106 F.3d at 749 (a state court decision is an "unreasonable application" of federal law if it is 'at such tension with governing U.S. Supreme Court precedents, or [is] so inadequately supported by the record, or [is] so arbitrary, that a writ must issue").

To sum up, the Illinois Supreme Court's determination regarding prejudice is unreasonable because it excised Weliczko from the sentencing equation and did not consider and then weigh Erickson's new psychological evidence against the aggravating evidence. It thus is an unreasonable application of clearly established Supreme Court precedent. Finally, the Illinois Supreme Court' s finding that the sentencing court did not rely on Weliczko's testimony is contradicted by the record, which shows that the sentencing court expressly considered this testimony. Hence, the Illinois Supreme Court's decision to the contrary is not a reasonable determination of the facts in light of the evidence presented at sentencing.

"Although questions of this kind do not lend themselves to . . . mathematical certainty," *Washington v. Smith*, 219 F.3d at 635, this court is firmly convinced that a federal constitutional right to effective assistance of counsel during sentencing was violated. *See Williams v. Taylor*, 529 U.S. at 389. Notwithstanding that the record contains evidence showing Erickson's lack of remorse and the savage nature of Launer's murder, counsel's sub-par representation at sentencing renders Erickson's death sentence suspect. *See Lockhart v. Fretwellwe*, 506 U.S. at 369.

Because Erickson's underlying claim that his trial counsel was constitutionally ineffective is meritorious, it follows that his claim of ineffective assistance of appellate counsel is also meritorious and the Illinois Supreme Court's decision in *Erickson III* to the contrary is also an

unreasonable application of clearly established federal law. Erickson is thus entitled to relief under § 2254 with respect to his sentence.

The court finds that Erickson's remaining claims are either procedurally defaulted or not meritorious. In light of the court's ruling with respect to the Weliczko ineffective assistance claim and in the interests of completeness, the court will thus only reach the merits of the remaining claims which are relevant to the disposition of Erickson's motion for discovery.

## IV. Erickson's Motion for Discovery

"Our system affords a defendant convicted in state court numerous opportunities to challenge the constitutionality of his conviction. He may raise constitutional claims on direct appeal, in post conviction proceedings available under state law, and in a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. §2254 .... These vehicles for review, however, are not available indefinitely and without limitation." *Daniels v. United States*, 121 S. Ct. 1578, 1582-83 (2001) (internal citations omitted). Therefore, discovery in a habeas proceeding is only available "if, and to the extent that, the judge in the exercise of his [or her] discretion and for good cause shown grants leave to do so, but not otherwise." Rule 6(a) of the Rules Governing Habeas Corpus Cases Under §2254.

To obtain discovery under Rule 6, Erickson must: (1) identify the essential elements of his constitutional claims and (2) show good cause for the discovery. *Bracy v. Gramley*, 520 U.S. 899, 908 (1997); *Blankenship v. Circuit Court of Cook County*, 59 F. Supp.2d 736, 739 (N.D. Ill. 1999). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. at 908-9.

Erickson's motion for discovery requests leave to seek discovery as to the following matters:

1. All documents relating to any criminal investigation, arrest, indictment, conviction, or sentence of Harold Matthews, including any plea agreement, prosecutorial guarantee, or other benefits extended to Matthews by the State of Illinois in exchange for his testimony;

2. Case files assembled by the State relating to Harold Matthews and JoAnn Combs;

3. All documents relating to any impeachment evidence regarding any State witness in this case, including, without limitation, Harold Matthews and Harvey Greenway.

4. All documents relating to any exculpatory evidence concerning Mr. Erickson.

5. All documents relating to any inculpatory evidence concerning anyone other than Mr. Erickson.

6. All documents relating to John Weliczko's federal and state criminal convictions.

For the reasons set forth below, Erickson has failed to establish good cause for discovery.

## A.   Matthews

Because Erickson's claims regarding Matthews are meritless, discovery would be pointless. Matthews, who claimed to have heard Erickson confess to killing Launer while the two were incarcerated together and who described Erickson as a "modern day Jack Ripper," testified during the sentencing phase on behalf of the State. Count II of Erickson's petition relates to the State's alleged failure to disclose Matthews on its witness list and to provide Erickson with information about Matthews' criminal record and Matthews' plea bargain with the State in return for his testimony in Erickson's case. Erickson claims that the State's failure to list Matthews as a witness prevented trial counsel from adequately preparing a cross-examination of Matthews in violation of Erickson's rights under the Sixth Amendment. He also asserts that the

State had an affirmative duty to discover and disclose impeachment evidence to the defense under *Giglio v. U. S.,* 405 U.S. 150 (1972), and *Brady v. United States,* 397 U.S. 742, 748 (1970). In essence, Erickson contends that, if the State had disclosed Matthews and provided him with information about his criminal history and the plea bargain, it is reasonably probable that he would not have been sentenced to death.

Erickson acknowledges that he has not presented this claim to the Illinois courts and asks this court to stay his §2254 petition so he can file a third state post-conviction petition. Alternatively, he contends that he can show cause and prejudice and hence excuse his procedural default. In response, the Respondent asserts that Erickson cannot establish cause because he could have independently researched Matthews' criminal record and cannot establish prejudice because, in any event, this information would not have affected Erickson's sentence. In addition, citing *United States v. Szabo,* 147 F.3d 559 (7th Cir. 1998), the Respondent opposes Erickson's request for a stay, claiming that there is no evidence that his previous two state post-conviction appeals were deficient in a fundamental way.

### 1.      Erickson's Request for a Stay

The court will first consider Erickson's request for a stay so he can  file a third state post-conviction petition raising his *Brady* claim and exhaust this claim.  A district judge, in the exercise of her discretion, may stay a §2254 petition while a habeas petitioner pursues relief in the state courts.  *U.S. ex rel. Williams v. Gilmore*, 104 F. Supp. 2d 931, 931-32 (N.D. Ill. 2000). Here, however, Erickson has not established that the Illinois courts would reach the merits of a third state post-conviction petition or that such a petition would be properly filed under 28 U.S.C. §2244(d)(2).  *See generally Tinker v. Hanks,* 172 F.3d at 991.  While Erickson may not have

-48-

appreciated the full extent of Matthews' criminal history, the fact that Matthews allegedly heard Erickson confess while both men were incarcerated would be a clear tip-off that Matthews had, at the very least, been charged with engaging in some sort of criminal activity.[7] This means that Erickson's *Brady* claim is barred unless he can establish that the cause and prejudice exception to procedural default applies to him.[8]

## 2.    Cause and Prejudice

The cause and prejudice analysis overlaps with Erickson's *Brady* claim, so this court will discuss cause and prejudice and the merits of the *Brady* claim together. This is because *Brady* looks to whether: (1) the evidence at issue was favorable to a defendant because it was either exculpatory or impeaching; (2) the State suppressed the evidence, either willfully or inadvertently; and (3) the defendant was prejudiced. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The suppression prong of a *Brady* claim parallels the cause prong of cause and prejudice, as Erickson claims that the State's suppression of information relating to Matthews establishes cause for his failure to raise this issue in his state court proceedings. *See Strickler v. Green*, 527 U.S. 263, 282 (1999) (cause exists where "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule").

Similarly, both *Brady* and the prejudice prong of cause and prejudice look to whether there is a reasonable probability that his sentence would have been different if the State had

---

[7]  In fact, during sentencing, Matthews admitted that he had been arrested for theft of services. (R. 2276-78).

[8]  Erickson does not claim that the other exception to procedural default – a fundamental miscarriage of justice – applies to him so the court will confine its discussion to cause and prejudice.

disclosed the suppressed documents. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995). The "reasonable probability" standard is difficult to meet, as "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id* at 289-90. In other words, it is not enough that testimony of the witness about whom impeaching evidence was withheld made a "petitioner's conviction more likely than if [the witness] had not testified, and discrediting [the witness] might have changed the outcome of the trial." *Id.* at 289. With these standards in mind, the court simultaneously turns to both cause and prejudice and the merits of Erickson's *Brady* claim.

### 3. Erickson's Brady Claim

In *Brady*, the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87; *see also Giglio v. U. S.*, 405 U.S. 150 (1972). Impeachment evidence is within the ambit of the *Brady* rule. *United States v. Bagley*, 473 U.S. 667, 676-77 (1985); *People v. Pecoraro*, 175 Ill.2d 294, 347 (Ill. 1997).

With respect to the scope of the State's obligation to learn of and disclose evidence, the prosecutors have an affirmative duty to disclose evidence that is favorable to the defense as well as a duty to learn of any other "favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. at 432; *see also Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir.1999) (applying pre-AEDPA law). This means that prosecutors cannot use their failure to investigate to avoid their obligations under *Brady*.

-50-

disclosed the suppressed documents. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995). The "reasonable probability" standard is difficult to meet, as "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id* at 289-90. In other words, it is not enough that testimony of the witness about whom impeaching evidence was withheld made a "petitioner's conviction more likely than if [the witness] had not testified, and discrediting [the witness] might have changed the outcome of the trial." *Id.* at 289. With these standards in mind, the court simultaneously turns to both cause and prejudice and the merits of Erickson's *Brady* claim.

### 3.  Erickson's Brady Claim

In *Brady*, the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87; *see also Giglio v. U. S.*, 405 U.S. 150 (1972). Impeachment evidence is within the ambit of the *Brady* rule. *United States v. Bagley*, 473 U.S. 667, 676-77 (1985); *People v. Pecoraro*, 175 Ill.2d 294, 347 (Ill. 1997).

With respect to the scope of the State's obligation to learn of and disclose evidence, the prosecutors have an affirmative duty to disclose evidence that is favorable to the defense as well as a duty to learn of any other "favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. at 432; *see also Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir.1999) (applying pre-AEDPA law). This means that prosecutors cannot use their failure to investigate to avoid their obligations under *Brady*.

-50-

*Crivens v. Roth*, 172 F.3d at 996.

On the other hand, the *Brady* burden does not rest entirely on the State. If a defendant, through a reasonable exercise of diligence, would have been able to obtain the evidence himself, that defendant cannot complain that the State failed to provide him with that evidence. *Id.* at 997; *United States v. Dimas*, 3 F.3d 1015, 1019 (7th Cir. 1993) (evidence was not "suppressed" under *Brady* if the defendants could have obtained the evidence themselves with reasonable diligence); *United States v. White*, 970 F.2d 328, 336 (7th Cir. 1992) ("Evidence cannot be regarded as 'suppressed' by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence").

Here, Matthews had, unbeknownst to Erickson at the time of sentencing, been convicted of a number of offenses, including impersonating a federal officer, larceny, fraud, and illegal entry. (Am. App. Ex. 32). Erickson could have used this information to impugn Matthews' credibility during Erickson's sentencing hearing. In his filings before this court, Erickson has adopted a contradictory position with respect to how accessible this information was to the State: on the one hand, he claims that it took him seventeen years and a Herculean effort to uncover it, and on the other hand, he claims that the State could have easily discovered it and simply failed to do so.

At the time of sentencing, Erickson knew that, at the very least, Matthews had some sort of criminal background since Erickson met Matthews in a correctional facility. Erickson did, however, ask for further information relating to Matthews at the beginning of his sentencing proceedings. Moreover, because the State did not list Matthews on its witness list, Erickson could not have tried to obtain the information independently before sentencing. This is not to

say, of course, that a reasonable exercise of diligence would have only uncovered the information about Matthews now, in time for Erickson's federal habeas case, given that Erickson's state court proceedings took many, many years to complete. Nevertheless, the Respondent does not contend that the information regarding Matthews was not in the possession of an arm of the State. *Crivens v. Roth*, 172 F.3d at 997-98. We will thus, for the sake of argument, accept Erickson's claim that he could not have reasonably uncovered the information regarding Matthews any sooner than he did, assume that cause exists and move onto prejudice.

According to Erickson, the State relied on Matthews' testimony to establish that Erickson was the actual killer and showed no remorse. Erickson also claims that he was prejudiced by the State's failure to disclose Matthews' plea agreement with the State. Erickson contends that the suppressed evidence is material, and argues that there is a reasonable probability that he would not have been sentenced to death if he had been able to more thoroughly impeach Matthews. We disagree.

First, the State's failure to disclose Matthews' full criminal history did not prejudice Erickson. The sentencing judge noted during sentencing that Erickson devised the plan by which to sexually assault and murder Lauder, produced the sock, tie, and knife; transported Launer to the site of the crime; bound Launer; cut off her clothes; and "plunged the knife into her heart and again into her stomach and in the aftermath gloated about how the blood had spurted from her heart." (R. 2498-99). The court also found that Erickson's attempt to shift the blame to Fairweather was unpersuasive because Fairweather was "wholly incapable of producing such mayhem." (R. 2499).

In addition, the court held that Erickson had demonstrated no remorse or contrition and that his testimony was "so deficient and so lacking and so incredible as to tax the gullibility of the credulous." (R. 2504). The court then briefly summarized each of the witnesses produced by the State in aggravation, making only a cursory mention of Mathews' testimony, and briefly summarized Erickson's evidence in mitigation. (R. 2499-03). In short, a careful review of the record fails to show that it is reasonably probable that Matthews' testimony was the straw that broke the proverbial camel's back with regard to the imposition of the death penalty and fails to establish that Erickson's sentence is not worthy of confidence.

We also note our disagreement with Erickson's claim that Matthew's testimony played an important role in the court's finding that Erickson was the actual killer. As noted above, the trial court flatly rejected Erickson's version of events and expressed his agreement with the jury's fining, during the guilt phase of the trial, that Erickson murdered Launer. (R. 2499-99). Similarly, we disagree with Erickson's claim that Matthews' testimony was essential to establish Erickson's lack of remorse. The court stated, "I heard and listened to the Defendant's explanation of this horrible event as he testified before the jury … [t]here was no remorse." (R.2503). Thus, Matthews' testimony during sentencing was merely cumulative.

It is also important to note that Matthew's credibility was already at issue during sentencing. Matthews testified that he had been arrested for theft of services based on his failure to pay for a six week stay at the Rolling Meadows Holiday Inn. (R. 2276). He also admitted that he was unable to pay for his hotel stay and that he was subsequently incarcerated in the Cook County Jail. (R. 2276-78). Thus, the sentencing judge was alerted to the fact that Matthews had a criminal record. While he may not have appreciated the full extent of that criminal record, this

-53-

court cannot conclude that adding additional convictions to the record of a peripheral witness would have "substantially reduced or destroyed" Matthews' credibility and "resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *See Kyles v. Whitley*, 514 U.S. at 441. Therefore, Erickson has failed to show that prejudice resulted from the State's failure to disclosure Matthew's criminal history.

The State's failure to provide Erickson with a copy of Matthew's plea bargain with the State also did not violate *Brady*. Erickson asserts that he would have used this information to impeaching Matthews and that this would have turned the tide for him. However, the State only is required to reveal a plea agreement if the witness testifies falsely as to the existence of such an agreement. *Giglio v. United States*, 405 U.S. at 154-55; *People v. Pecoraro*, 175 Ill.2d 294, 313 (Ill. 1997).

For example, in *Giglio*, a key witness testified that he had never been told he would not be prosecuted and the government expressly stated in closing that it did not promise that the witness would not be indicted. 405 U.S. at 151-52. The Supreme Court held that, because the jury had been told that the witness was not subject to a plea agreement, due process required the government to reveal the existence of the plea agreement so the defense could impeach the witness.

In contrast, neither Matthews nor the State claimed that Matthews had not entered into a plea agreement with the State. Moreover, Erickson could have cross-examined Matthews as to this issue. If he had done so, false testimony by Matthews – not the presence of the plea agreement in and of itself – would have triggered the State's obligation to produce the agreement. *See Giglio v. United States*, 405 U.S. at 154-55; *see also People v. Pecoraro*, 175 Ill.2d 294 at

-54-

313. Thus, the State did not violate *Brady*, and Erickson suffered no prejudice, as a result of the State's failure to provide Erickson with a copy of Matthews' plea agreement.

In sum, the fact that Erickson did not know, at the time of sentencing, about Matthews' full criminal history or that Matthews had entered into a plea bargain with the State does not mean that his sentence is unworthy of confidence. Hence, Erickson has failed to establish that cause and prejudice excuse his failure to raise these issues before the Illinois courts. Because Erickson does not claim that the "actual innocence" exception applies, we conclude that his claims relating to Matthews are procedurally defaulted. Hence, Erickson by definition cannot establish good cause for any discovery relating to Matthews.

### B.   Combs & Greenway

As noted above, at sentencing, Police Detective Greenway testified that one of Erickson's former girlfriends, Joanne Combs told him that Erickson slapped her around, impregnated her, and threatened to kill her if she told anyone that he was the father. According to Erickson, if his trial lawyer had sought discovery, he would have discovered that Combs denied making the statements attributed to her by Greenway and hence would have been able to impeach Greenway.

The claim that counsel was constitutionally ineffective due to his failure to seek discovery is procedurally defaulted since it does not appear in either of Erickson's state post-conviction petitions. Specifically, in Erickson's first state post-conviction petition, he contended that his trial counsel's failure to seek discovery relating to the State's aggravating evidence was constitutionally ineffective. He did not include any specific allegations of prejudice arising from the lack of discovery. Instead, he simply stated that his lawyer was ineffective because he failed

to seek discovery and that there was a reasonable probability that his sentence would have been different if counsel had sought discovery.

On appeal to the Illinois Supreme Court, the only mention of this argument is Erickson's assertion that "counsel's failure to seek discovery of the prosecution's evidence in aggravation" was prejudicial. (Respondent Ex. G at 45). This claim is one of a long list of other ineffective assistance claims. Moreover, unlike the failure to pursue discovery claim, Erickson's counsel discussed each of the other ineffective assistance claims individually. A few general words in an eighty-three page brief are not enough to present an issue to the Illinois Supreme Court. *See* Illinois Supreme Court Rule 341(e)(7) (a petitioner waives an issue if his brief does not include the factual basis of his allegations, a discussion of those allegations, and supporting authorities). Similarly, they are not enough to frame an issue in federal constitutional terms. *See Verdin v. O'Leary*, 972 F.2d at 1474-75. Finally, it is well-established that the failure to present a claim to the Illinois Supreme Court results in waiver of that claim. *People v. Clark*, 48 Ill.2d 554 (Ill.1971); *Jenkins v. Gramley*, 8 F.3d 505, 507 (7th Cir. 1993).

Erickson does not claim that either his first state post-conviction petition or appeal was somehow fundamentally deficient. *See People v. Flores*, 153 Ill.2d at 273-74. Moreover, this ineffective assistance claim was directed at Erickson's trial, as opposed to appellate, counsel. *See* Pet. Rep. Br. Pg. 14-15. Therefore, he was not entitled to raise this claim in a second state post-conviction petition. *See Erickson III*, 183 Ill.2d at 223. Erickson also does not assert that cause and prejudice excuse his default. Accordingly, the court finds that this claim is procedurally barred.

In an attempt to resuscitate this claim, Erickson argues that he presented it to the Illinois Supreme Court in his appeal from the denial of his second post-conviction petition and that the court improperly failed to rule on it. As noted above, because he failed to include this argument in his appeal from the denial of his first state post-conviction petition, he was not entitled to try again in his second state post-conviction petition. In any event, the court finds that the Illinois Supreme Court was not required to address the merits of this claim. Erickson does not direct the court to any particular portion of his filings.

Although the court should not have to scour the record without guidance from Erickson, it has nevertheless located the following statements which relate to Erickson's claim that his lead trial counsel Glenn Seiden failed to conduct discovery regarding the State's aggravating evidence.

First, in Erickson's second state post-conviction petition, he states:

67. At the aggravation phase, the State presented numerous witnesses to testify with respect to various bad acts that Erickson had allegedly committed.

68. Seiden, however, was wholly unaware of the nature of the aggravating evidence the State intended to present at the sentencing hearing.

69. Indeed, Seiden never even filed a motion requesting discovery of such evidence.

70. Seiden did not move for discovery of the State's evidence in aggravation because he did not believe that a defendant was entitled to such discovery under Illinois law, even though such motions are customary.

71. Seiden thus did not know in advance what the State planned to present, and he therefore could not have prepared for the State's evidence in preparation for cross-examination of the State's witnesses.

(Erickson Ex. 45)

Notably, however, Erickson's memorandum in support of his second state post-conviction petition does not raise this claim as an independent argument or specifically reference any supporting authority or constitutional principle. Instead, the memorandum bunches in general assertions regarding trial counsel's failure to seek discovery as to the State's aggravating evidence with Erickson's claim that the cumulative effect of counsel's errors made his representation ineffective.

Specifically, under the heading "Proceedings Leading up to Second Post-Conviction Petition," Erickson's memorandum lists numerous failings of counsel and states that "Seiden also failed to appear for closing arguments, and failed to move for a bill of particulars, to at least be on notice of what aggravating evidence the State would proffer. The . . . cumulative effect of these deficiencies was prejudicial to Erickson." (Memorandum at 19). Similarly, under the heading "Erickson Suffered Actual Prejudice as a result of Seiden's Cumulative Performance," Erickson's memorandum again lists numerous failings of counsel, and states, "counsel in capital cases routinely move for discovery and a bill of particulars regarding the aggravating factors the prosecution intends to present at sentencing. Yet, in this case, Seiden did none of the above. Not only did Seiden not begin a simultaneous preparation of the sentencing and trial phase, he never prepared for sentencing at all." (Memorandum at 36).

Erickson then sets forth two specific grounds for relief: (1) "the failure of Erickson's appellate counsel to raise on direct appeal the ineffective assistance of trial counsel constitutes ineffective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments"; and (2) "the failure of Erickson's appellate counsel to raise on direct appeal the fraudulent and incompetent testimony given by John Weliczko, testimony that violated

Erickson's Eighth and Fourteenth Amendment rights, constitutes ineffective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments." (Ex. 45 at 20-21).

It is true that certain words, when taken out of context and then read together, add up to a statement that Erickson's trial counsel failed to seek discovery regarding the State's aggravating witnesses. But does this mean that this claim was fairly presented to the Illinois Supreme Court? The passing references of this theory in Erickson's memorandum do not raise this argument as a separate claim that is different from Erickson's cumulative error theory (which is also raised as an additional argument in his § 2254 petition).

Moreover, Erickson does not specifically tie this argument into any federal cases employing constitutional analysis or any state cases applying constitutional analysis to a similar factual situation. *See Wilson v. Briley*, 243 F.3d at 327. In addition, while a claim of ineffective assistance calls to mind a specific constitutional right, and such a claim is well within the mainstream of constitutional litigation, Erickson's general mention of this claim and his failure to discuss it or to include it in his specific claims for relief means that it is barred.

Finally, even if Erickson did, in fact, properly raise this claim in his second state post-conviction petition, the Illinois Supreme Court was under no obligation to consider it because Erickson should have raised it in his first state post-conviction appeal. While the Illinois Supreme Court could have overlooked this state procedural rule, it was entitled to rely on it as an independent and adequate state ground. *See, e.g., U.S. ex rel. Bell v. Pierson*, — F.3d —, 2001 WL 1029282 at *9. Accordingly, we conclude that this claim is procedurally defaulted. And because discovery in a federal habeas case is not available to resuscitate an otherwise

procedurally barred claim, Erickson's request for discovery regarding Combs and Greenway is denied.

### C. Exculpatory and Inculpatory Evidence Relating to Erickson

"A habeas petitioner may not use discovery for fishing expeditions to investigate mere speculation." *U.S. ex rel. Blankenship v. Circuit Ct. Cook County*, 59 F. Supp.2d at 739. Thus, good cause for discovery only exists where a habeas petitioner provides specific allegations which show that he may be entitled to relief if the facts are more fully developed. *Id.* In turn, discovery in a habeas case is not available if a habeas petitioner simply wishes to investigate theories which were not raised in state court proceedings as collateral remedies are not limitless. *See Daniels v. United States*, 121 S. Ct. at 1582-83. Because Erickson's generalized requests for discovery fail to set forth specific grounds which potentially warrant relief and do not relate to matters raised before the Illinois courts, his request for leave to pursue discovery of alleged additional inculpatory and exculpatory evidence is denied.

### D. Weliczko

Because the court has granted relief with respect to Erickson's Weliczko claim, his request for discovery as to this claim is moot.

## V. Conclusion

For the above reasons, this court grants Erickson's petition for a writ of habeas corpus based on ineffective assistance of counsel at the sentencing phase of his state court proceedings but denies the petition in all other respects. We hereby vacate Erickson's sentence of death. The state shall have 180 days from the issuance of this order to resentence Erickson. On the court's own motion, execution of this order shall be stayed pending the disposition of any appeal filed by

the parties. It is further ordered that Erickson's motions for a stay and for discovery are denied.

The clerk is directed to terminate this case and enter judgment in Erickson's favor.

DATE: SEP 2 8 2001

_Blanche M. Manning_
Blanche M. Manning
United States District Court Judge

99cv6468.hab